UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| DEUTSCHE BANK NATIONAL TRUST COMPANY, | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 3:11-0763 |
| SHONN TERRACE TIBBS, *et al.*, | ) ) ) | Judge Sharp |
| Defendants. | ) | |

## MEMORANDUM

In this action in which Plaintiff Deutsche Bank National Trust Company ("DBNTC") seeks a declaration in favor of the priority and enforceability of the Saxon deed of trust lien on Defendants Shonn Terrance Tibbs' and Tracey Lynette Tibbs' residence, or alternatively, damages based on the Tibbs' alleged involvement in a conspiracy to deprive the bank of its lawful rights in the property, Magistrate Judge Bryant has issued a Report and Recommendation (Docket No. 85) relating to the parties' cross-motions for summary judgment. Specifically, Magistrate Judge Bryant recommends that DBNTC's Motion for Summary Judgment be granted insofar as it requests a judgment declaring the enforceability of the lien of the Saxon deed of trust, that its conspiracy claims be dismissed, and that the Tibbs' Motion for Summary Judgment be denied.

The Tibbs Defendants, proceeding *pro se,* have filed objections to the R&R (Docket No. 88). After DBNTC responded to those objections (Docket No. 89), the Tibbs, now represented by counsel, filed a reply (Docket No. 93), to which Deutsche Bank filed a sur-reply (Docket No. 99).

1

**I.**

Under Rule 72(b)(3) of the Federal Rules of Civil Procedure, this court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Having undertaken that review, the Court agrees with Magistrate Judge Bryant's recommended disposition and, accordingly, the Court will grant DBNTC's Motion for Summary Judgment as to the enforceability of its lien, and deny the Tibbses' Motion for Summary Judgment.

**II.**

In the R&R, Magistrate Judge Bryant set forth the undisputed facts, including that

> 1. On March 16, 2007, defendant Shonn T. Tibbs signed an adjustable rate note in principal amount of $749,900.00 in favor of lender Saxon Mortgage, Inc. (the "Saxon note") . . . . Plaintiff DBNTC is the successor in interest to Saxon Mortgage, Inc. and is the present holder of this note.

(Docket No. 85 at 3) (internal citation omitted). The Tibbses object to this being an "undisputed fact" because, on December 7, 2012, and prior to the issuance of the R&R, they were granted leave to amend their Answer to allege that they "do not know whether or not plaintiff is in fact the holder in due course of the Note in question." (Docket No. 55 at 5, ¶ 17). They argue that they should be granted time for discovery to determine if DBNTC actually holds the Note.

Magistrate Judge Bryant cannot be said to have erred in stating, as an undisputed fact, that DBNTC is the successor in interest to Saxon and the holder of the note. In support of its Motion for Summary Judgment, and as required by this Court's Local Rules, DBNTC filed Statement of Material Facts in which it stated, among other things:

> 7. Saxon endorsed the Note as follows:
> Without Recourse
> Pay to the Order of
> Saxon Mortgage, Inc.
> By: (s) Dawn Adams

2

>       Dawn Adams, Assistant Vice-President
>       And Assistant Secretary
>
> [Doc. 1, Compl., ¶ 17; Doc. 1-6, Adjustable Rate Note, p. 5; Doc. 14, Answer, ¶ 17; see also Memorandum, p. 4.]
>
> 8. Ocwen Loan Servicing, LLC ("Ocwen") is servicing agent for DBNTC respecting, among other mortgage loans, the loan evidenced by the Note and secured by the Saxon Deed of Trust. [Doc. 73-1, Affidavit of Paul Myers, ¶ 1, 3.]
>
> 9. Throughout this action, DBNTC, Ocwen as servicing agent for DBNTC, Ocwen's counsel, or DBNTC's counsel in this action have had physical custody of the Note. [Doc. 73-1, Affidavit of Paul Myers, ¶¶ 4-5; Doc. 69, Certificate of Physical Custody; Doc. 69-1, Adjustable Rate Note.]

(Docket No. 75 at 6-7). Those statements, and the citations to the documents in the record, including the Certificate or Physical Custody, suggest that DBNTC is the successor in interest to Saxon and the holder of the note.

The Tibbses did not respond to DBNTC's Statement of Facts as required by this Court's rules. "Failure to respond to a moving party's statement of material facts . . . within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for purposes of summary judgment." L.R. 56.01(g). As such, Magistrate Judge Bryant was entitled to conclude that the undisputed facts showed DBNTC to be successor in interest to Saxon Mortgage, Inc. and the present holder of the note.

The Tibbses' (and their counsel's) assertion that they need time to discover whether in fact DBNTC holds the note is unavailing. That they waited almost nine months to move to amend their Answer does not alter the fact that whether DBNTC was the rightful holder of the note has been at issue since the inception of the case. The allegation appears in the Complaint (Docket No. 1 at 4, ¶ 17), and is the first allegation DBNTC makes in its theory of the case contained in the Initial Case Management Order (Docket No. 30 at 1). The Tibbses unquestionably understood this to be an issue

because, in their own Motion for Summary Judgment, they asserted that "Deutsche Bank did not succeed to the interest of Saxon Mortgage until April 22, 2010," (Docket No. 65 at 3) which is after DBNTC filed a claim in the Tibbses' bankruptcy case, a point reiterated in their response to DBNTC's Motion for Summary Judgment (Docket No. 88 at 5). If discovery needed to be had on this issue, it should have occurred during the time set for discovery in the Initial Case Management Order, an extension should have been sought before that deadline, or a motion for discovery should have been filed in response to DBNTC's Motion for Summary Judgment. See Fed. R. Civ. P. 56(d) ("If a movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may; (2) allow time . . . to take discovery.").

### III.

The Tibbses present an extended discussion about mortgage backed securities, Pooling and Servicing Agreements, and the interplay between Article 3 and Article 9 of the Uniform Commercial Code ("UCC") in relation to the transfer and enforcement of promissory notes and mortgages. They argue "that **Ownership** of the mortgage loan, note and deed of trust is all that counts when it comes to Mortgage Notes that have been sold," that "Article 3 principals [sic], such as 'holder' and 'negotiation' have no relevance to sales of mortgage notes," that Article 9 controls because "negotiable instrument law is irrelevant to all issues involving the transfer of mortgages and their underlying promissory notes," and that "Courts nationwide have not applied the correct rules of law." (Docket No. 88 at 7-9) (bold in original). Apparently similar arguments have been soundly rejected. See In re Connelly, 487 B.R. 230, 240 (Bankr. D. Ariz. 2013) ("Plaintiff's pleadings are filled with inapposite legal theories unsupported by facts or law. For example, in the Response's discussion of how UCC Articles 3 and 9 affect the PSA and MLPA, Plaintiff never acknowledges

4

that he is not a party to those contracts and fails to cite a single case from the Ninth Circuit to support his arguments."). Regardless, and at the risk of joining those courts who the Tibbses claim to have gotten it wrong, the Court rejects their arguments both for procedural and substantive reasons.

Procedurally, the Tibbses did not present their Article 3/Article 9 dissertation to Magistrate Judge Bryant, just as they did not present to Magistrate Judge Bryant several other arguments contained in their *pro se* objections and counsel's reply . "Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate." Murr v. United States, 200 F.3d 895, 902 n.1 (6th Cir. 2000). Rather, the Act "permits district courts to review *de novo* the issues that were raised and argued before a magistrate judge"; "allowing parties to litigate their case before the magistrate and, if unsuccessful, to present new theories and evidence to the district court 'would frustrate the [Act's] purpose' of increasing judicial efficiency." Whitaker v. Astrue, 2012 WL 3231015, at *2 (M.D. Tenn. Sept. 23, 2011) (quoting Greenhow v. Sec'y of Health & Human Servs., 863 F.2d 633, 638–39 (9th Cir. 1988)).

Substantively, the Tibbses' argument fails. In cases involving negotiable instruments secured by real property, Articles 3 and 9 or the UCC are not mutually exclusive because, while Article 9 applies to the sale of promissory notes, Article 3 provides the rules governing payments if the note is a negotiable instrument. In re Veal, 450 B.R. 897, 913-14 (BAP 9th Cir. 2011). Moreover, to enforce a note, the holder need not be the owner, but rather must be entitled to enforce it as that phrase is defined in Article 3. Id.

5

Under Article 3 of the UCC and Tennessee's codification thereof, a "negotiable instrument"

> (a) . . . means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> > (1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
> >
> > (2) Is payable on demand or at a definite time; and
> >
> > (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (I) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Tenn. Code Ann. § 47-3-106. All of the hallmarks of a promissory note are met with respect to the Adjustable Rate Note signed by Shonn Tibbs: (1) at the time it was issued, the note was payable on its face to the lender, Saxon Mortgage; (2) the note is an unconditional promise to pay $749,900 plus interest; (3) the note is payable at a fixed date or dates; and (4) the note contains no undertaking on the part of the maker or anyone else to do anything other than to pay money in accordance with the terms of the note.

In their objections, the Tibbs have not shown otherwise. They argue that DBNTC "failed to address ¶5 of Defendants' note which has an express condition to payment," (Docket No. 93 at 4), but do not develop this argument in any way.

Paragraph 5 is simply a clause allowing prepayment and requiring the borrowers to inform the noteholder when they are making a prepayment. "Many notes issued in commercial transactions are secured by collateral . . . [and] are subject to prepayment [and this] does not prevent the note from being an instrument if the statement is in the note itself." Tenn. Code. Ann. § 47-3-106, cmt.

1. Moreover, "[a] promise or order is 'payable at a definite time' if it is payable on elapse of a definite period of time after sight or acceptance or at a fixed date or dates or at a time or times readily ascertainable at the time the promise or order is issued, subject to rights of (i) prepayment[.]" Tenn. Code Ann. § 47-3-108(b).

While the parties cite no cases to support their respective positions regarding the effect of a prepayment clause, courts in jurisdictions which have adopted the UCC have held that [a borrower's] right to prepay the Note and the provisions regarding prepayment notice contained in the Note do not destroy its negotiability." Porterfield v. JP Morgan Chase Bank, N.A., 2013 WL 5755499, at *3 (E.D.N.C. Oct. 23, 2013) (collecting cases); see Mallin v. JP Morgan Chase Bank, N.A., 2013 3423822, at *8 (E.D. Tenn. July 8, 2010) (finding that note was negotiable instrument under Tennessee law, notwithstanding plaintiff's argument that it required additional undertakings because it allowed prepayment only after informing the holder). As has been explained:

> the right of [a party] ... to prepay part of the principal does not constitute an "additional undertaking or instruction' that adversely affects the negotiability of the note. Quite the opposite, the right of prepayment is a voluntary option that defendants may elect to exercise solely at their discretion. Indeed, such an allowance confers a benefit, not a burden, upon defendants, who can freely choose to decline the opportunity. The fact that defendants must notify the lender in the event they opt for prepayment imposes no additional liability on them and is not a condition placed on defendants' promise to pay. Rather, notification is simply a requirement of the exercise of the right of prepayment which, as noted, defendants are free to reject. This requirement does not render the note in issue non-negotiable."

Picatinny Fed. Credit Union v. Fed. Nat'l Mortg. Ass'n, 2011 WL 1337507 at *7 (D.N.J. April 7, 2011) (quoting, HSBC Bank USA v. Gouda, 2010 WL 5128666 (N.J. App. Div. Dec. 17, 2010)).

The Tibbses also claim that there are two versions of the Note in the record, "[o]ne a blank endorsement and one with an allonge which was never permanently attached to the note," and they need discovery to determine which note is proper. (Docket No. 93 at 4). They do not point the Court

7

to where in the record those two notes may be found.

Attached to DBNTC's complaint is a copy of the note (Docket No. 1-6), but that does not contain an allonge.[1] There is a document captioned "ALLONGE" in the submissions filed by the Tibbses (Docket No. 68-1 at 10), but this does not appear to be attached to the note and, so does not qualify as an endorsement on the note itself. See, Tenn. Code Ann. 47-3-204(a) ("For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument."). And if it were attached to the note, this only confirms DBNTC's status as holder because the allonge, signed by Saxon Mortgage, Inc., makes the note executed by Shonn T. Tibbs in the amount of $749,900 payable to DBNTC. (Id. at 10). As for the note said to have a "blank endorsement," this does not destroy its status as a negotiable instrument because, "[w]hen endorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially endorsed." Tenn. Code. Ann. § 47-3-205(b).

"By statute in Tennessee, a promissory note is a negotiable instrument, unless it contains a statement that it is non-negotiable, . . . and thus may be transferred to another party who receives the right to enforce the instrument[.]" Dauenhauer v. Bank of New York Mellon, 2013 WL 209250, at * 4 (M.D. Tenn. Jan. 16, 2013). "Moreover, under Tennessee law, [a] Deed of Trust need not be separately assigned so that the holder may enforce the note; as goes the note, so goes the Deed of Trust." Hixson v. Wilson and Assoc., PLLC, 2013 WL 6147826, at *2 (E.D. Tenn. Nov. 22, 2013).

---

[1] An allonge is "'[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements.'" RL BB ACQ II- FL Land 360, LLC v. Macland, 360, LLC, 2013 915205, at *2 n.2 (E.D. Tenn. March 8, 2013) (quoting Blacks Law Dictionary (9th ed. 2009)). In Tennessee, "'[a]n indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement.'" Id. (quoting Tenn. Code Ann. § 47–3–204, cmt. 1).

Since the record before the Court establishes that DBNTC is the current holder of the Saxon note and since a deed of trust follows the note that it secures, DBNTC is entitled to enforce the lien of the Saxon deed of trust.

## IV.

The Tibbses contend they "were ambushed by Plaintiff's litigation" because the focus of the Complaint is on an alleged conspiracy between the Tibbses and others, and the "civil conspiracy claim is the sole basis for which DBNTC asserts a claim for damages." (Docket No. 93 at 2). They argue:

> The Plaintiff's only reason for filing this lawsuit was to obtain possession of Defendants' property. The Defendants were left litigating a civil conspiracy case regarding their alleged participation in the recording of documents that gave rise to a foreclosure that lacked proper notice to the Plaintiff when in fact, the Plaintiff's goal was to take an end run around Defendants by settling with the other Defendants without allowing the Defendants to properly defend the standing issue. The Plaintiff settled with the other defendants and obtained a subordination agreement granting them first lien position all without the Defendants being able to launch a proper defense.

(Docket No. 93 at 2).

The Court does not know whether DBNTC's "only reason for filing this lawsuit was to obtain possession of Defendants' property" or whether its "goal was to take [sic] an end run around the Defendant." What the Court does know, and what the Complaint itself made clear, is that DBNTC was not simply seeking money damages for the alleged conspiracy. While the Complaint states that the "civil conspiracy claim is the sole basis for which DBNTC asserts a claim for *damages* against Mr. and Mrs. Tibbs," that very same paragraph alleges that "DBNTC is entitled to have a constructive trust in the Property declared in its favor." In its prayer for relief, DBNTC reiterates that it is entitled to have a constructive trust declared in its favor, or that "this Court find

9

that the Saxon Deed of Trust is a first-priority lien on the Property and has priority over the Apr. 2007 and Oct. 2010 Mid-State Deeds of Trust and the Wiseco Deed of Trust." (Id. at 10-11 ¶¶ 2 & 4(a)). This position was confirmed in the Initial Case Management Order, with DBTNC's "primary claim" being that the Mid-State deed of trust was subordinate to the Saxon deed of trust, and that if DBNTC prevailed on its priority claim, the conspiracy claim would be moot. (Docket No. 30 at 2).

The Complaint and Initial Case Management Order aside, the Tibbses could not have been laboring under the impression that only money damages were at stake because, within months of the case being filed, Mr. Tibbs exchanged correspondence with counsel for DBNTC. This correspondence confirmed that "the deed of trust priority issues" were "the primary concern" of DBNTC, and that any claim for damages would be obviated if, in fact, the Tibbses did not take the position that the Saxon deed of trust was subordinate to the Mid-State deed of trust. (Docket Nos. 94-1, 94-2, 94-3 & 94-4).[2] There was no ambush.

## V.

Having considered the matter *de novo* and all of the argument raised by the Tibbses, both *pro se* and through counsel, the Court concludes that Magistrate Judge Bryant's recommended disposition is correct. Accordingly, the R & R will be accepted, the Tibbses' Motion for Summary Judgment will be denied, and DBNTC's Motion for Summary Judgment will be granted insofar as

---

[2] To the extent that this correspondence may have taken place in an effort to settle the case, this does not preclude the Court's consideration of the same. Rule 408 of the Federal Rules of Evidence bars the introduction of evidence to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." However, the rule "'does not require exclusion when evidence is offered for another purpose,'" and "[c]ourts have routinely admitted evidence of offers or agreements to compromise for purposes of rebuttal, for purposes of impeachment, or to show the defendant's knowledge and intent." Thompson v. Safeway, Inc., 2002 WL 500547, at *2 (N.D. Ill. 2002) (collecting cases).

it seeks judgment declaring the enforceability of the lien of the Saxon deed of trust.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE